**THE STROJNIK FIRM L.L.C.**
**ATTORNEYS AT LAW**
**ESPLANADE CENTER III SUITE 700**
**2415 East Camelback Road**
**Phoenix, Arizona 85016**
**(602) 510-9409**

PETER K. STROJNIK, ESQ.
AZBN 026082, CABN242728
strojnik@skplaw.com

***Attorney for Plaintiff Tracy Rexroat***

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TRACY REXROAT, an Arizona resident,<br><br>Plaintiff,<br><br>vs.<br><br>ARIZONA DEPARTMENT OF EDUCATION; STATE OF ARIZONA, STATE BOARD OF EDUCATION,<br><br>Defendants. | NO. 2:11-cv-01028-PGR<br><br>**MOTION TO DISQUALIFY COUNSEL FOR DEFENDANT DUE TO SUBORNING PERJURY OF WITNESS**<br><br>(Oral Argument Requested) |

**MOTION TO DISQUALIFY COUNSEL**

Plaintiff Tracy Rexroat, by and through undersigned counsel, hereby respectfully moves to disqualify Attorney Rachel Bacalzo as counsel of record for Defendant in this action pursuant to LRCiv 83.2(e) and the relevant Arizona Rules of Professional Conduct. The grounds for this Motion are Attorney Bacalzo suborned perjury of a witness in this action, intimidated, pressured and argued with a witness, attempted to influence a witness, and demeaned and disparaged Plaintiff's former counsel. While disqualification is an "extreme

measure", Attorney Bacalzo's misconduct in this action affects the integrity of this lawsuit and calls into question the testimony and affidavits of her client's employees and supervisors.

WHEREFORE, Plaintiff respectfully requests Attorney Bacalzo be disqualified from this lawsuit. This Motion is more fully supported by the Declaration of Stephanie Hahn and the below Memorandum of Points and Authorities, which by reference is incorporated herein.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

In this lawsuit, Plaintiff Tracy Rexroat alleges that she is being paid approximately $20,000.00 less per year than three men who have the same job title, same or less skill level, same or less education level, same Defendant-provided training, and who perform the same daily job duties as Ms. Rexroat. During the course of this lawsuit, Ms. Rexroat's former counsel deposed Stephanie Hahn (the "witness"), who is an employee with the Arizona Department of Education (ADE). Counsel for Defendant, Rachel Bacalzo, spent nearly four hours "preparing" Ms. Hahn for her deposition. As of the date of this Motion, Ms. Hahn has waived her attorney-client privilege with the Arizona Attorney General's office.

During Attorney Bacalzo's "preparation" of Ms. Hahn for the deposition, she argued with her, intimidated her, attempted to influence her, and suborned perjury of the witness. Attorney Bacalzo pressured and used her position as an assistance attorney general to pressure the witness into testifying as Attorney Bacalzo wanted her to testify despite the witness repeatedly advising that would be untruthful and calling into question the ethics of Attorney Bacalzo's request. *Attorney Bacalzo was so persistent and pressuring that at one point she*

*asked the witness to define "ethical"*. The witness felt as though "if I did not agree with her or accept her representations than I was stupid."

The witness was terrified and knew Attorney Bacalzo "*was trying to coach me to testify in accord with her representations without actually saying 'I want you to testify this way'*". Indeed, the witness "knew exactly what she was doing, and I did not want anything to do with it."

During this same meeting, Attorney Bacalzo demeaned and disparaged Ms. Rexroat's former lawyers, attempted to influence the witness by telling her that Ms. Rexroat "did not have a case" and further advised the witness that Ms. Rexroat could not prove her case because her (former) lawyers had "messed up the case."

## II. FACTUAL BACKGROUND

To avoid any discrepancy between the witness's account of Attorney Bacalzo's deposition "preparation" and transmitting this information to this Motion, Ms. Rexroat hereby reproduces each pertinent paragraph of the witness's Declaration as follows. The paragraph numbers below correspond to the paragraph numbers of the witness's Declaration, which is attached hereto as Exhibit 1.

3. I want to first apologize to the Court for not bringing this to its attention earlier. I was and continue to be fearful of losing my job at the ADE if I advised the Court of my conversation with Rachel Bacalzo. There is an atmosphere of fear and intimidation at the ADE with respect to Ms. Rexroat's lawsuit. Many people at the ADE, especially Janet Brite, are very fearful of being fired because of the lawsuit Ms. Rexroat filed against the ADE. It was not until I retained my current counsel that I became comfortable bringing this matter to the attention of the Court.

4. The ADE in conjunction with the Arizona Attorney General's office create an atmosphere of fear and intimidation with respect to Ms. Rexroat's lawsuit, and the ADE has altered job duties and appears willing to do anything to avoid liability in Ms. Rexroat's case. A perfect example of the extent to which the ADE will go to avoid liability is that they recently, right around the time Ms. Rexroat sued the ADE, gave Jason Wojcik supervisory responsibilities to make it appear his job was tougher or required more effort than others.

5. The principal example of the efforts the ADE will undertake to win, however, is the subject of the conversation I had with ADE's lawyer Rachel Bacalzo in preparation for my deposition in this case. At the outset, I want to ensure the Court that I did not take Ms. Bacalzo's advice and I did not perjure myself. At the time Ms. Bacalzo prepared me, I wanted to help the ADE because I was part of a team atmosphere but I could not deviate from the truth and could not agree with the wild representations Ms. Bacalzo presented to me. I am willing to go to court and tell the Judge face to face exactly what is contained herein.

6. On February 23, 2012, Billy Belanger from the ADE's human resources division called me and told me that Ms. Rexroat had filed a lawsuit against the ADE, and that I should expect a call from Ms. Bacalzo regarding a deposition I would have to give under oath. Ms. Belanger also told me that I should not talk to anyone about the lawsuit because she said that was not appropriate. Ms. Belanger also told me that Ms. Bacalzo would answer any questions I had, and she also gave me Ms. Bacalzo's phone number.

7. A day or two later, Ms. Bacalzo called me at my office regarding Ms. Rexroat's lawsuit. She advised me that she needed to meet with me to represent me as an employee of the ADE and to prepare me for the deposition I was going to have to give. My deposition had been scheduled for March 9, 2012. We scheduled the appointment at her office for February 29, 2012 at 2:00 p.m., which was a Wednesday.

10. When I met with Ms. Bacalzo, I could tell immediately that she was attempting to intimidate me. During the entire conversation, it was my general sense that Ms. Bacalzo wanted me to testify as she explained the facts to me. I felt as though if I had a choice between agreeing with Ms. Bacalzo's representations or she would continue to argue with me. She repeatedly told me that Ms. Rexroat does not have a case because she said all State Supervisors have to have specific expertise as to each program area we supervise and she tried to convince me of this for nearly four hours. As discussed below, this is an outlandish claim because State Supervisors are "supervisors". It was my impression that Ms. Bacalzo knew what she was telling me was not true, but she wanted to convince me and pressure me to agree to testify that this expertise was necessary.

11. She initially told me about the case, what Ms. Rexroat was claiming, and that she did not have a case. Ms. Bacalzo further told me that Ms. Rexroat could not prove her case because Ms. Rexroat's lawyers had messed up the case or had made mistakes, something along those lines. She made it a point to demean Ms. Rexroat's former lawyers.

12. She told me our meeting would take one to two hours, but as I describe below, the meeting took nearly four hours because of Ms. Bacalzo's argumentative behavior in attempting to convince me my truthful answers were not correct. The majority of the meeting was confrontational, and while I do not wish to admit it, I was very intimidated by Ms. Bacalzo. It was my impression that she had an agenda to ensure I testified as she wanted and would attempt to pressure and intimidate me to do the same.

///

///

///

///

///

///

14. We also discussed the issue of similarity of job responsibilities between all State Supervisors. This portion of our meeting lasted for a very long time because Ms. Bacalzo kept arguing with me about what my job responsibilities are and what I and other State Supervisors need to know to do our jobs. She said that if I were asked a question about skills or education we needed as State Supervisors to do our job, she tried to convince me that we all need a specific background in each program area to which we are assigned. I explained to her that it would not be true to say that because as State Supervisors, we are managers. The skill set for managers is the same. I also explained that even if that were the case that State Supervisors needed a background in each of the areas we are assigned, none of the State Supervisors, including me, has the background in each program area assigned. I explained that all State Supervisors essentially do the same thing on a daily basis and that our jobs are interchangeable. For nearly two hours, Ms. Bacalzo continued to argue with me and continued to pressure me to testify in accord with her argument. She presented every hypothetical in the book in an attempt to convince me to testify that State Supervisors must have specific expertise in the program areas they oversee. I cannot and could not do that because it simply is not true. I was also very offended that Ms. Bacalzo, who is someone that is not a State Supervisor, would tell me what my job entails.

15. She kept pressuring me and insisting that her version of what State Supervisors do and need to know is correct, and I told her that it was not true and that ADE's practices are unethical. She was visibly frustrated with her inability to convince me of her representations. She then very aggressively asked me to define the word "ethical". I could not define it, but I used a Martin Luther King and slavery as a reference.

16. Ms. Bacalzo persisted with this area and asked me to tell her my job responsibilities, Jason Wojcik's responsibilities and Ms. Rexroat's responsibilities. I explained that we all had the same job responsibilities such as professional development, reviewing end of program assessment results, etc. I further explained that our daily job duties were the same. She then jumped back to "but" you have to have expertise and a background in each of the areas you supervise. I felt as though she would not stop until I agreed to testify to her version of the "facts". I was terrified because I knew she was trying to coach me to testify in accord with her representations without actually outwardly saying "I want you to testify this way." I knew exactly what she was doing, and I did not want anything to do with it.

17. We next discussed who is and is not a State Supervisor. Ms. Bacalzo gave me a list of persons, the names of whom I cannot remember, but I do recall that the list she gave me was of persons who were not State Supervisors. Rather, they were CTSO advisors, grants people, data people, etc. I told Ms. Bacalzo that these persons were not State Supervisors and their duties were very different. She also discussed these persons' salaries, and it was my strong impression that she wanted me to agree with her that they should be compared with State Supervisors. I told her that State Supervisors jobs are different than the persons she listed. Once again, she persisted and attempted to convince me that CTSO advisors, grants people, etc. were the same as State Supervisors.

19. In addition to Ms. Bacalzo attempting to persuade me to testify in a way that deviated from the truth for nearly four hours, she also had a demeanor about her that she believed she was more important than me, and that if I did not agree with her or accept her representations than I was stupid.

///

///

///

## III. ARGUMENT AND SUPPORTING LAW

### A. The Integrity of This Profession Cannot Be Maintained if Attorney Bacalzo Continues to Practice

The District of Arizona has adopted the Arizona Rules of Professional Conduct as its ethics standards and accordingly this District applies the Arizona ethics rules when decision of a Motion to Disqualify Counsel. LRCiv 83.2(e); Research Corp. Techs., Inc. v. Hewlett Packard Co., 936 F. Supp. 697, 700 (D. Ariz. 1996); see also In re Cnty. of L.A., 223 F.3d 990, 995 (9th Cir. 2000) (stating that federal courts "apply state law in determining matters of disqualification" and that they "follow the reasoned view of the state supreme court when it has spoken on the issue"); Christiansen v. U.S. Dist. Court, 844 F.2d 694, 697 n. 6 (9th Cir. 1988) (when a district court adopts the state's ethics rules, the district court must apply those rules when considering a motion to disqualify).

"[C]lose of doubtful cases are resolved in favor of disqualification in order to preserve the integrity of the judicial system." Richards v. Holsum Bakery, Inc., 2009 WL 3740725, at *6 (D. Ariz. Nov. 5, 2009); see also Kaiser v. AT&T, 2002 WL 1362054, at *5 (D. Ariz. Apr. 5, 2002) (same). "[T]he paramount concern must be the preservation of public trust in the scrupulous administration of justice and in the integrity of the bar." Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co., 264 F. Supp. 2d 914, 918 (N.D. Cal. 2003). Furthermore, the "public's interest in the administration of justice weighs heavily in favor of disqualification" in certain circumstances. Kaiser. This case is clearly one of those circumstances since it calls out counsel on her subornation of perjury, intimidation of a witness, and attempted influence of a witness.

Attorney Bacalzo's behavior has not only been hostile and uncooperative in this lawsuit, it has also been unquestionably unethical bordering on criminal. In a unique set of events, Attorney Bacalzo's former client (Stephanie Hahn) has waived her attorney-client privilege with the Attorney General's Office and has provided a tell-all of Attorney Bacalzo's deposition "preparation" of her in this lawsuit. During this deposition "preparation", Attorney Bacalzo spent nearly four hours attempting to intimidate (and actually intimidating) the witness into changing her deposition testimony so that Attorney Bacalzo's version of the "facts" was adopted, attempting to influence the witness by advising that Ms. Rexroat "does not have a case", demeaning Ms. Rexroat's former counsel, and arguing and pressuring the witness. See Ex. 1 at ¶14 ("*I cannot and could not do that because it* ***simply is not true***") (emphasis supplied); Id. at ¶16 ("*I was terrified because I knew* ***she was trying to coach me to testify in accord with her representations*** *without actually saying 'I want you to testify this way'. I knew exactly what she was doing, and* ***I did not want anything to do with it***") (emphasis supplied); Id. at ¶14 ("*For nearly two hours, Ms. Bacalzo continued to argue with me and continued to pressure me to* ***testify in accord with her argument***") (emphasis supplied); Id. at ¶11 ("*She initially told me ... that she [Rexroat]* ***did not have a case****. Ms. Bacalzo further told me that Ms. Rexroat could not prove her case because* ***Ms. Rexroat's lawyers had messed up the case or had made mistakes***") (emphasis supplied). And when the witness called into question the ethics of the matter, Attorney Bacalzo lashed out at her. See Id. at ¶15 ("*She kept pressuring me and insisting that her version of what State Supervisors do and need to know is correct, and I told her that it was not true and that ADE's practices are unethical….* ***She then very aggressively asked me to define the word 'ethical'****. I could not define it, but I used a Martin*

*Luther King and slavery as a reference*") (emphasis supplied). Attorney Bacalzo also advised the witness that if she did not recall one minor detail as part of a larger question that she may know the answer to, she should state "***I don't remember***". Id. at ¶13 (emphasis supplied). While disqualification of Attorney Bacalzo is a drastic measure, Plaintiff only recently discovered the content of Attorney Bacalzo's deposition preparation. For this federal Court to maintain the integrity of this grand profession, it cannot allow Attorney Bacalzo to continue practice in this action (or in any action) because her preparation of the witness may also be practiced with other witnesses in this action at summary judgment and at trial and may be practiced in other actions.

**B. Attorney Bacalzo Suborned a Witness in this Action to Perjure Herself – ER 8.4**

It is professional misconduct to:

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;..

ER 8.4 (c)-(d). An attempt to obtain false testimony constitutes suborning perjury. See Matter of Fioramonti, 176 Ariz. 182, 187, 859 P.2d 1315, 1320 (1993) (*court mandated three-year suspension when a lawyer suborned perjury during State Bar investigation*). "There is not more egregious violation of a lawyer's duty as an officer of the court, and no clearer ethical breach than deliberately eliciting false testimony from his client." In re Peasley, 208 Ariz. 27, 31, 90 P.3d 764, 768 (2004) (*lawyer disbarred for eliciting false testimony*).

In Attorney Bacalzo's zeal to win this action, she attempted to pressure and intimidate the witness in an effort to convince her to testify in accord with Attorney Bacalzo's representations even though the witness advised that was not true, to wit:

> 12. She told me our meeting would take one to two hours, but as I describe below, the meeting took nearly four hours because of Ms. Bacalzo's argumentative behavior in attempting to convince me my truthful answers were not correct. The majority of the meeting was confrontational, and while I do not wish to admit it, I was very intimidated by Ms. Bacalzo. It was my impression that she had an agenda to ensure I testified as she wanted and would attempt to pressure and intimidate me to do the same.

Ex. 1 at ¶12. Ms. Bacalzo persisted and continued to attempt to convince the witness that her truthful answers were false, and that the witness should testify in accord with Ms. Bacalzo's misrepresentations, to wit:

> 14. We also discussed the issue of similarity of job responsibilities between all State Supervisors. This portion of our meeting lasted for a very long time because Ms. Bacalzo kept arguing with me about what my job responsibilities are and what I and other State Supervisors need to know to do our jobs. She said that if I were asked a question about skills or education we needed as State Supervisors to do our job, she tried to convince me that we all need a specific background in each program area to which we are assigned. I explained to her that it would not be true to say that because as State Supervisors, we are managers. The skill set for managers is the same. I also explained that even if that were the case that State Supervisors needed a background in each of the areas we are assigned, none of the State Supervisors, including me, has the background in each program area assigned. I explained that all State Supervisors essentially do the same thing on a daily basis and that our jobs are interchangeable. For nearly two hours, Ms. Bacalzo continued to argue with me and continued to pressure me to testify in accord with her argument. She presented every hypothetical in the book in an attempt to convince me to testify that State Supervisors must have specific expertise in the program areas they oversee. I cannot and could not do that because it simply is not true. I was also very offended that Ms. Bacalzo, who is someone that is not a State Supervisor, would tell me what my job entails.

Id. at ¶14.  At one point, the witness advised Attorney Bacalzo that what Attorney Bacalzo wanted her to testify to was not true, and that the ADE's practices were unethical.  Attorney Bacalzo then became aggressive with the witness, to wit:

> 15. She kept pressuring me and insisting that her version of what State Supervisors do and need to know is correct, and I told her that it was not true and that ADE's practices are unethical. She was visibly frustrated with her inability to convince me of her representations. She then very aggressively asked me to define the word "ethical". I could not define it, but I used a Martin Luther King and slavery as a reference.

Id. at ¶15.  Attorney Bacalzo continued to persist and be argumentative with the witness.  She would not stop with her persistence (over a period of four hours) until the witness agreed to testify in the manner Attorney Bacalzo desired.  The witness was terrified because she "*knew she was trying to coach me to testify in accord with her representations without actually saying "I want you to testify this way"*, to wit:

> 16. Ms. Bacalzo persisted with this area and asked me to tell her my job responsibilities, Jason Wojcik's responsibilities and Ms. Rexroat's responsibilities. I explained that we all had the same job responsibilities such as professional development, reviewing end of program assessment results, etc. I further explained that our daily job duties were the same. She then jumped back to "but" you have to have expertise and a background in each of the areas you supervise. I felt as though she would not stop until I agreed to testify to her version of the "facts". I was terrified because I knew she was trying to coach me to testify in accord with her representations without actually outwardly saying "I want you to testify this way." I knew exactly what she was doing, and I did not want anything to do with it.

Id. at ¶16. There is no difference between a lawyer saying "I want you to testify to these facts" and the lawyer arguing and spending nearly four hours arguing with a witness that the witness' truthful testimony is incorrect. One is conspicuous, and the other is inconspicuous.

In addition to Attorney Bacalzo "*attempting to persuade me to testify in a way that deviated from the truth for nearly four hours, she also had a demeanor about her that she believed she was more important than me, and that if I did not agree with her or accept her representations than I was stupid.*" Id. at ¶19 (emphasis supplied).

Attorney Bacalzo's reprehensible behavior in these respects amounts to dishonesty, fraud, deceit and misrepresentation, and seriously undercut the administration of justice. Even more reprehensible is the fact that Attorney Bacalzo is an employee of our State's government, and not only is she held to the high standards of the Arizona State Bar, but also to the standards that Arizona citizens expect of elected officials and their administration. While Attorney Bacalzo's zeal is respected, her subornation of perjury by pressuring, intimidation and arguing with a witness to change her truthful testimony is outright despicable.

**C. Attorney Bacalzo Demeaned Rexroat's Former Counsel and Intimidated, Argued With and Mistreated a Witness in this Action**

"In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay or burden any other person, or use methods of obtaining evidence that violate the legal rights of such a person." ER 4.4.

In Attorney Bacalzo's four-hour meeting with the witness, she not only attempted to suborn perjury, but she also intimidated, pressured, and used her status as a lawyer for the State to aggressively persuade witness to testify differently than what Ms. Hahn knew to be the truth

and communicated to be the truth. Ex. 1 at ¶16. Ms. Hahn felt intimidated and terrified. In addition to this suborning perjury, intimidation, pressuring and causing Ms. Hahn to feel terrified, Attorney Bacalzo also disparaged Ms. Rexroat's former lawyers while communicating to the witness that Ms. Rexroat has no case. <u>See</u> Id. at ¶11 ("*Ms. Bacalzo further told me that Ms. Rexroat could not prove her case because Ms. Rexroat's lawyers had messed up the case or had made mistakes*") (emphasis supplied).

**D. <u>Attorney Bacalzo Attempted to Influence the Witness – ER 8.4</u>**

In addition to Attorney Bacalzo suborning perjury, pressuring and intimidating a witness, and disparaging her colleagues, she also attempted to influence the witness's testimony by advising her that Ms. Rexroat "did not have a case". Ex. 1 at ¶11. Attorney Bacalzo went so far as to say that "Ms. Rexroat could not prove her case because Ms. Rexroat's lawyers had messed up the case or had made mistakes." Id.

## IV. <u>CONCLUSION</u>

Attorney Bacalzo cannot continue to practice before this honorable Court (or before any Court) for her coaching of a witness in this lawsuit and subornation of perjury. Ms. Rexroat understands disqualification is an "extreme measure", but Attorney Bacalzo's actions affect the entirety of this case, calls into question the veracity of Defendant's affidavits and testimony, and will call into question Defendant's testimony at trial.

Accordingly, Plaintiff respectfully requests Attorney Bacalzo be disqualified from this action. For the Court's convenience, a proposed form of Order is attached.

RESPECTFULLY SUBMITTED this 27th day of September, 2012.

*/s/ Peter Kristofer Strojnik*
Peter Kristofer Strojnik (026082)
strojnik@skplaw.com
THE STROJNIK FIRM L.L.C.
Esplanade Center III, Suite 700
2415 East Camelback Road
Phoenix, Arizona 85016
602 510 9409 (tel)
602 532 7572 (fax)

***Attorney for Plaintiff Tracy Rexroat***